## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

MICHELLE D. MCDONALD,               :
                                    :
            Plaintiff,              :
                                    :
    v.                              :   C. A. No. 16-611-RGA-MPT
                                    :
CAROLYN W. COLVIN,                  :
ACTING COMMISSIONER OF              :
SOCIAL SECURITY                     :
                                    :
            Defendants.             :

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

This action arises from the denial of Plaintiff's claim for Social Security benefits.

On July 5, 2012, Plaintiff filed an application for Social Security Disability Insurance

benefits ("DIB") under Title II of the Social Security Act.[1]  Plaintiff also filed an

application for Supplemental Security Income under Title XVI of the Social Security Act

(the "Act") on September 19, 2013.[2]  In her applications and disability report, Plaintiff

alleged she became disabled on November 15, 2011 due to severe physical

impairments, including degenerative disk disease of the cervical spine and carpal tunnel

syndrome.[3]  Her claims were initially denied on September 11, 2012, and denied again

upon reconsideration on April 21, 2013.[4]  Following the denials, Plaintiff requested a

hearing before an Administrative Law Judge ("ALJ"), which occurred on September 10,

---

[1] D.I. 7-6 at 382

[2] Id.

[3] Id. at 382, 384.

[4] Id. at 382.

2014.[5]  At the hearing, testimony was provided by plaintiff and a vocational expert, Christina L. Beatty-Cody.[6]  ALJ Jack Penca found that Plaintiff did not qualify as "disabled" under either act and denied her request for benefits on November 3, 2014.[7]  After denial by the ALJ, Plaintiff requested review by the Social Security Appeals Council, but was denied.[8]  She then filed a timely appeal.[9]  Presently before the court are the parties' cross motions for summary judgement.  For the reasons that follow, the court will grant Defendant's motion.

## II.    BACKGROUND

Plaintiff was born on February 12, 1965.[10]  She has a high school education and worked in the past as a sales representative.[11]  She was 46-years-old at the onset of her alleged disability, which dates from November 15, 2011.[12]  In November 2011, she was released from her job because her physical impairments left her unable to keep up with its demands.[13]  Since then, she has developed increased neck and back pain, worsening arthritic changes in the cervical spine, and worsening carpal tunnel syndrome, for which she has undergone two surgeries on the right hand to date.[14]  Plaintiff also experiences gastrointestinal issues and associated chest pain, which

---

[5] D.I. 7-6 at 382.
[6] Id.
[7] Id.
[8] Id.
[9] Id.
[10] D.I. 12 at 2.
[11] Id.
[12] Id.
[13] D.I. 7-6 at 387.
[14] D.I. 7-6 at 387-89.

2

started in November 2013.[15] She has had numerous endoscopies, saw a phonetic specialist, and had gallbladder surgery in January 2014.[16] She is currently taking Linsas and has associated issues, forcing her to remain very close to a bathroom for most of the day.[17] Despite her prior vocational experience, Plaintiff claims she remains disabled under the Acts.[18] To be eligible, Plaintiff must demonstrate she is disabled within the Acts, which both have the same standard, as discussed below.

## A. Evidence Presented

Plaintiff allegedly suffers from a "myriad of issues," including:

> degenerative disease of the cervical spine in particular, as well as severe carpal tunnel syndrome, which she's had three procedures done on her dominant hand, the right hand. There's also recent developments of gastrointestinal disorders which are also causing her to experience extreme symptoms . . . bilateral manual dexterity issue [which] would eliminate pretty much all work . . . .[19]

The combination of the impairments is plaintiff's basis for concluding she is unable to perform any substantial gainful activity.[20] Plaintiff provided accounts of treatment from four separate medical doctors and treating facilities.[21] Records of treatment from Dr. Beebe, Plaintiff's primary treating physician, are particularly relevant to the present matters under consideration, because she contends that the ALJ's decision to afford no weight to the opinion of Dr. Beebe is in error.[22]

---

[15] D.I. 7-7 at 409.
[16] *Id*.
[17] *Id*. at 410.
[18] D.I. 10 at 1.
[19] D.I. 7-7 at 402-03.
[20] *Id*. at 402.
[21] *Id*. at 400-07.
[22] D.I. 10 at 1.

3

Dr. J. Kirkland Beebe, M.D. (hereinafter referred to as "Dr. Beebe") has been treating Plaintiff since November 28, 2011.[23] About six months later, on May 20, 2012, Plaintiff reported difficulty sleeping and problems related to arthritis in both shoulders.[24] X-rays of the cervical spine suggested significant arthritic changes.[25] Plaintiff also reported increased neck pain on July 2, 2012, and Dr. Beebe diagnosed osteoarthritis of the cervical spine and prescribed Aleve and Tylenol.[26]

Plaintiff's arthritic pain traveled to her extremities and increased in her back over the next few years.[27] On September 10, 2012, she complained of right hand numbness and was diagnosed with right carpal tunnel syndrome.[28] X-rays of the lumbar spine and bilateral knee x-rays showed significant arthritic changes, and Plaintiff's complaints of pain during visits with Dr. Beebe were consistent with these findings.[29] For example, she reported neck, shoulder, and knee pain on September 27, 2012.[30]

Most significantly, Dr. Beebe completed a Doctor's Certificate for the Delaware Department of Labor on November 20, 2012, wherein he diagnosed cervical radiculopathy and bilateral carpal tunnel syndrome, and concluded that Plaintiff was "disabled from all work indefinitely."[31] During follow-up appointments between December 5, 2012 and May 14, 2013, the following symptoms, prescriptions, and test

---

[23] D.I. 10 at 2.
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] D.I. 10 at 2.
[29] *Id.*
[30] *Id.*
[31] *Id.* at 3.

results were performed and noted: twelve therapy sessions for continued arthritic pain; aqua therapy, an MRI of the cervical spine, and Tramadol for decreased range of motion in the cervical spine; degenerative changes in the spinal canal with "moderately severe" narrowing of right neural foramen; right carpel tunnel syndrome and right ulnar nerve pain.[32]

In an assessment of Plaintiff noted in a Multiple Impairment Questionnaire dated July 2, 2013, Dr. Beebe diagnosed cervical degenerative disc disease, osteoarthritis with bilateral cervical radiculopathy, bilateral carpal tunnel syndrome, and cubital carpal tunnel syndrome.[33] The clinical findings, including numbness and pain in the hands evidenced by a nerve conduction study, a cervical MRI, and x-rays supported the assessment.[34] He also estimated that her level of pain "varied from moderate to moderately severe (5-8 on a scale of 10) and her level of fatigue was moderately severe (7 on a scale of 10)."[35] He further opined that she "could not sit and stand/walk up to a total of one hour each during an 8-hour work day," could not stand/walk continuously, must stand and move around for a period of 20 minutes each 15-20 interval if sitting, and could lift no more than five pounds, and could only do so occasionally.[36]

Dr. Beebe examined Plaintiff again on August 15, 2013.[37] In summary, the findings on that day concluded overall the same or worsening symptoms after steroid

---

[32] D.I. 10 at 3.
[33] *Id.*
[34] *Id.* at 4.
[35] *Id.*
[36] *Id.*
[37] D.I. 10 at 4.

5

injections months beforehand. He diagnosed "generalized osteoarthritis, cervical spondylosis without myelopathy, lumbosacral neuritis /radiculitis, and carpal tunnel syndrome."[38] Upon examination a month later on September 17, 2013, he documented similar findings in a second Multiple Impairment Questionnaire. Additionally, on November 5, 2013, he reported "severe pain in the right wrist."[39]

Most significant to the issues at hand, Dr. Beebe wrote a "narrative report," dated February 18, 2014, concluding Plaintiff was "disabled due to her cervical and lumbar osteoarthritis, degenerative disk disease, bilateral carpal tunnel and bilateral cubital tunnel syndromes that have not responded to surgery, steroid injections, or physical therapy."[40] He added that she was "very unlikely to be able to return to the workforce" because he did not expect her symptoms to improve.[41]

## B. Hearing Testimony

### 1. *Plaintiff's Testimony*

At the hearing on September 10, 2014, Plaintiff testified to her background, work history, and alleged disability.[42] Plaintiff worked as a sales representative for years at Walmart, Kmart, and Target, and at certain stores performed cleaning and set-up duties for cosmetic and hair care stations.[43] Her employment involved considerable walking and lifting, which required her to occasionally rest every twenty to thirty minutes to

---

[38] D.I. 10 at 4.
[39] *Id.*
[40] *Id.* at 5.
[41] *Id.*
[42] *See generally* D.I. 7-7.
[43] D.I. 7-7 at 416.

stretch.[44]  She was laid off in November 2011.[45]  During the time she was working, she related to Dr. Beebe "the toll it was taking on [her] body."[46]  She did not seek work after being laid off, but received unemployment compensation for a "sick claim," which was supported by Dr. Beebe, and did not require her to search for other jobs.[47]  After two years, her unemployment benefits ceased in December 2013.[48]

Concerning her daily activities, Plaintiff describes difficulty standing or sitting for more than twenty to thirty minutes at a time.[49]  She claims that she must stand and stretch, do exercise therapy movements for about ten minutes at a time, or use hot or cold compresses to ease pain.[50]  Neck movements or quick movements are difficult due to "pinching and burning sensations."[51]  Intense pain also travels from her back, down her legs, into her "big toe," causing numbness.[52]  She cannot feel the front of either calf.[53]  Her upward reach is limited, requiring the use of a step-stool for high cupboards.[54]  She can only lift a maximum of five pounds without pain, and must move very slowly to pick up articles from the ground.[55]  She underwent physical therapy for her back and neck for about a year from August 2012 to July/August 2013, but stopped

---

[44] D.I. 7-7 at 416.
[45] Id.
[46] Id.
[47] Id.
[48] Id.
[49] D.I. 7-7 at 403.
[50] Id. at 404.
[51] Id. at 403-04.
[52] Id.
[53] Id.
[54] D.I. 7-7 at 403-04.
[55] Id. at 411.

because of her first hand surgery.[56]

Plaintiff also experiences daily headaches, that radiate from the back of her neck to the top of her head. According to plaintiff, "[t]ylenol doesn't touch it," and she uses a TENS unit,[57] and hot or cold compresses for relief. As of the date of the hearing, Plaintiff was instructed by her doctor to walk for 15 minutes, 3 times a week. Since this advice was only provided a few days before the hearing, Plaintiff had not begun this therapy.[58]

Plaintiff describes constant burning and stinging sensation to her right palm and right wrist, which radiates to the right elbow into the fingers.[59] Her finger mobility is limited, making it difficult to write, open water bottles, and other similar hand movements.[60] Plaintiff is right-hand-dominant, but frequently needs assistance from her non-dominant left hand, because the fingers in her right hand "just stop working" after five to ten minutes.[61] She also experiences pain, discomfort, numbness, and tingling of the left hand. Although she uses hot/cold compresses, physical therapy exercises, and

---

[56] D.I. 7-7 at 417.

[57] "TENS stands for (Transcutaneous Electrical Nerve Stimulation). [These] are predominately used for nerve related pain conditions (acute and chronic conditions). TENS machines work[ ] by sending stimulating pulses across the surface of the skin and along the nerve strands . . . [to] help stimulate your body to produce higher levels of its own natural painkillers . . . ." *The Original TENS Unit*, (http://www.tensunits.com/) (last viewed on May 19, 2017). Plaintiff uses the TENS unit no more than 10 minutes a day, per directions from her therapist. She places it on her neck and lower back to stimulate the nerves, but has not been able to use it on her hand since the second surgery. D.I. 7-7 at 408.

[58] D.I. 7-7 at 408.

[59] *Id.* at 406-14.

[60] *Id.*

[61] *Id.* at 406.

8

oral medications for her right hand, relief is limited from these modalities.[62]  She feels her right hand is getting worse.[63]  The initial surgery on her right hand, a right carpal tunnel release, occurred on January 16, 2013,[64] and was later followed by a second procedure, a right cubital tunnel release, on September 18, 2013.[65]  In light of her prior surgeries, plaintiff does not presently feel that surgery on her left hand is a viable option.[66]

Additionally, plaintiff experiences gastrointestinal issues, which began in November 2013.[67]  She regurgitates food[68] with associated chest pain.[69] Treatment for these symptoms involved numerous endoscopies, a referral to a phonetic specialist,[70] and gallbladder surgery in January 2014, which left her "basically bedridden," vomiting, and in excruciating pain for several months, and required assistance from family members.[71]  She currently takes Linsas, does two colon preps a week, and attends therapy sessions at Seaside Castro.[72]  The side effects from the Linsas includes severe diarrhea and abdominal pains.[73] She has also undergone physical therapy since June to help her abdominal muscles and sphincter release waste properly; however, she is unable to

---

[62] D.I. 7-7 at 406-14.
[63] Id.
[64] D.I. 10 at 6.
[65] Id. at 7.
[66] D.I. 7-7 at 407.
[67] Id. at 409.
[68] Id.
[69] Id.
[70] Id.
[71] D.I. 7-7 at 419.
[72] Id. at 409.
[73] Id. at 410.

9

evacuate her bowels without medication.[74]

Plaintiff testified that she requires assistance with household tasks, including vacuuming, mopping floors and cleaning bathrooms.[75] Presently, her niece helps with cleaning and takes her grocery shopping.[76] Plaintiff is only able to do one "less than full" load of laundry a week. Due to her pain and lack of mobility of her hands, she described some difficulty bathing, washing her hair, and dressing.[77] Because her finger dexterity is limited, tying her shoes is very difficult. She takes about an hour nap, twice daily.[78] Plaintiff has difficulty standing for long periods, so her meal preparation is usually limited to making sandwiches, soup, or other "easy things."[79]

Plaintiff testified that sitting or standing at a desk all day and moving her head is very difficult. In fact, she complained during the hearing of a large amount of pain with a "headache starting, [and] pressure" due to sitting, and verbalized the need to stand and move around.[80]

### 2. *Vocational Expert's Testimony*

During her testimony, the vocational expert, Beatty-Cody, was asked to consider a hypothetical individual of Plaintiff's age, education, and work history who could perform work at a "light exertional level," occasionally climb ladders,

---

[74] D.I. 7-7 at 410.
[75] *Id.* at 413-14.
[76] *Id.*
[77] *Id.*
[78] *Id.*
[79] D.I. 7-7 at 414.
[80] *Id.* at 415.

ropes, and scaffolds, occasionally crawl, frequently reach overhead with both arms, and was subject to frequent exposure to extreme cold and heat, humidity, vibration, fumes, odors, dust, gases, and poor ventilation.[81] Beatty-Cody concluded such a hypothetical individual could perform plaintiff's past work.[82]

Beatty-Cody was further requested to consider other versions of the hypothetical individual involving certain limitations. Regarding the limitation of difficulty reaching overhead, she concluded Plaintiff could perform her past work.[83] However, with the limitation of only occasionally being able to handle, finger, and feel with both hands, the expert stated that the restriction would preclude past work, including a position as a type copy examiner.[84]

Beatty-Cody also considered the same hypothetical individual who needed to alternate standing and sitting every thirty minutes, specifically to stand ten minutes after sitting for thirty minutes, while remaining "on task,"[85] as opposed to being on a break.[86] She testified that employment for such a person was feasible. However, if the same limitation cause the individual to be "on a break," then any work would be precluded because the restriction would affect productivity, and result in excessive breaks.[87]

For the same individual working at a sedentary level, the expert concluded

---

[81] D.I. 7-7 at 421-24.
[82] *Id.*
[83] *Id.*
[84] *Id.*
[85] "On task" means the employee is not taking a break. *Id.*
[86] D.I. 7-7 at 423.
[87] *Id.* at 424.

11

Plaintiff's past employment would be precluded, but the individual could be a "surveillance system monitor and telephone quotation clerk . . . ."[88] The type copy examiner position would be excluded as well. [89]

When asked to consider an individual at the light exertional level that was unable to reach overhead bilaterally, grasp/turn/twist objects, and use fingers and hands for fine manipulations, Beatty-Cody testified these limitations would preclude any type of work.[90] Further, if only use of the dominant hand was excluded for such these tasks, any type of work would still be precluded. She additionally opined that if a hypothetical individual with the same age, education, and work history as Plaintiff was expected to miss work more than three times a month due to any impairment, pain, symptom, or treatment, employers would consider such absences excessive and work preclusive.[91]

### C.    ALJ's Finding of Facts and Conclusions of Law

1.    Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2017.

2.    Plaintiff has not engaged in substantial gainful activity since November 15, 2011, the alleged onset date.

3.    Plaintiff has the following severe impairments: degenerative disk disease of the cervical spine, carpal tunnel syndrome, and asthma.

4.    Plaintiff does not have an impairment, or combination, that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

---

[88] *Id.*

[89] D.I. 7-7 at 424.

[90] *Id.* at 425.

[91] *Id.*

12

5. Plaintiff has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can occasionally climb ladders, ropes or scaffolds; can occasionally crawl, can occasionally reach overhead with both upper extremities; can occasionally handle, finger, and feel with her bilateral upper extremities; and can have frequent exposure to extreme cold, extreme heat, humidity, vibration, and fumes, odors, dust, gas, and poor ventilation.

6. Plaintiff is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. Plaintiff was born February 12, 1965, making her 46 years old, which characterizes her as a younger individual (ages 18-49), on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. Plaintiff has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not Plaintiff has transferable job skills (SSR 82-41; 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. Plaintiff has not been under a disability, as defined in the Social Security Act, from November 15, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Conclusively, "[b]ased on the application for a period of disability and disability insurance benefits protectively filed on July 3, 2012, [Plaintiff] is not disabled under sections 216(i) and 223(d) of the Social Security Act." Further "[b]ased on the application for supplemental security income filed on September 27, 2013, [Plaintiff] is not disabled under section 1614(a)(3)(A) of the Social Security Act."

## III. STANDARD OF REVIEW

### A. Motion for Summary Judgment

Both parties move for summary judgement. In determining the appropriateness of summary judgment, the court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party[,]' but [refraining from] weighing the evidence or making credibility determinations." If "there is no genuine issue as to any material fact" and the movant is entitled to judgment as a matter of law, summary judgment is appropriate.

This standard does not change merely because there are cross-motions for summary judgment. Cross-motions for summary judgment:

> are no more than a claim be each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute and agreement that if one is rejected the other necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

"The filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party."

### B. Court's Review of the ALJ's Findings

Section 405(g) sets forth the standard of review of an ALJ's decision. The court may reverse the Commissioner's final determination only if the ALJ did not apply the proper legal standards, or the record did not contain substantial evidence to support the decision. Factual findings are upheld if supported by substantial evidence. Substantial evidence means less than a preponderance, but more than a mere scintilla of evidence. As the United States Supreme Court has found, substantial evidence "does not mean a

14

large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

In determining whether substantial evidence supports the Commissioner's findings, the court may not undertake a *de novo* review of the decision nor re-weigh the evidence of record. The court's review is limited to the evidence that was actually presented to the ALJ. The Third Circuit has explained that a:

> single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (e.g., evidence offered by treating physicians) or if it really constitutes not evidence but mere conclusion.

Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable. Even if the court would have decided the case differently, it must defer to and affirm the ALJ, so long as the decision is supported by substantial evidence.

Where "review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision." In *SEC v. Chenery Corp.*, the Court found that a "reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." "If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." The Third Circuit has recognized the applicability of this finding in the Social Security disability context. This court's review is limited to

15

the four corners of the ALJ's decision. In Social Security cases, the substantial evidence standard applies to motions for summary judgment brought pursuant to FED. R. CIV. P. 56.

## C.    ALJ's Disability Determination Standard

The Supplemental Social Security Income (SSI) program was enacted in 1972 to assist "individuals who have attained the age of 65 or are blind or disabled" by setting a minimum income level for qualified individuals.[92] In order to establish SSI eligibility, a claimant bears the burden of proving that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of or not less than twelve months."[93] Moreover, "the physical or mental impairment or impairments must be of such severity that the claimant is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in significant numbers in the national economy."[94] Furthermore, a "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are evidenced by medically acceptable clinical and laboratory diagnostic techniques.[95]

---

[92] See Sullivan v. Zebley, 493 U.S. 521, 524 (1990) (citing 42 U.S.C. § 1381 (1982 ed.)).
[93] 42 U.S.C. § 423(d)(1)(A).
[94] 42 U.S.C. § 423(d)(2)(A).
[95] 42 U.S.C. § 423(d)(3).

### 1. Five-Step Test.

The Social Security Administration uses a five-step sequential claim evaluation process to determine whether an individual is disabled.[96]

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. If a claimant is found to be engaged in substantial activity, the disability claim will be denied.
>
> In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. If the claimant fails to show that her impairments are 'severe', she is ineligible for disability benefits. In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. The claimant bears the burden of demonstrating an inability to return to her past relevant work. If the claimant is unable to resume her former occupation, the evaluation moves to the final step.
>
> At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. The ALJ will often seek the assistance of a vocational expert at this fifth step.[97]

If the ALJ determines that a claimant is disabled at any step in the sequence, the analysis stops.[98]

---

[96] See 20 C.F.R. §416.920(a); see also Plummer v. Apfel, 186 F.3d 422 (3d Cir. 1999).

[97] Plummer, 186 F.3d at 427.

[98] See 20 C.F.R § 404.1520(a)

## 2. Weight Given to Treating Physicians

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight."[99]  Moreover, such reports will be given controlling weight where a treating source's opinion on the nature and severity of a claimant's impairment is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record.[100]

The ALJ must consider medical findings supporting the treating physician's opinion that the claimant is disabled.[101]  If the ALJ rejects the treating physician's assessment, he may not make "speculative inferences from medical reports," and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence."[102]

However, a statement by a treating source that a claimant is "disabled" is not a medical opinion:  rather, it is an opinion on an issue reserved to the ALJ because it is a finding that is dispositive of the case.[103]  Therefore, only the ALJ can make a disability determination.

---

[99] Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000)

[100] Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001).

[101] Morales v. Apfel, 225 F.3d 310, 317 (citing Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)).

[102] Plummer, 186 F.3d at 429.

[103] See 20 C.F.R. § 416.927 (e)(1).

### 3. *Evaluation of Subjective Accounts of Pain*[104]

Statements about the symptoms[105] alone never establish the existence of any impairment or disability. The Social Security Administration uses a two-step process to evaluate existence and severity of symptoms.

### 5. *Existence of Pain*

First, the ALJ must find a medically determinable impairment – proven with medically acceptable clinical and laboratory diagnostic data – that could reasonably be expected to produce the claimant's symptoms. Otherwise, the ALJ cannot find the applicant disabled, no matter how genuine the symptoms appear to be.

This step does not consider the intensity, persistence and limiting effects of the symptoms on the claimant: it only verifies whether a medical condition exists that could objectively cause the existence of the symptom.

Analysis stops at this step where the objectively determinable impairment meets or medically equals one listed in 20 CFR Part 404, Subpart P, Appendix 1, because the claimant is considered disabled *per se*.

### 6. *Severity of Pain*

At step two, the ALJ must determine the extent to which the symptoms limit the claimant's ability to do basic work activities. Therefore, he must determine the

---

[104] *See* 20 C.F.R §§ 416.928-29. *See also* SSR 96-7p.
[105] A symptom is an individual's own description of physical or mental impairments such as pain, fatigue, shortness of breath and other complaints. *See* SSR 96-7p.

applicant's credibility.[106]

At this step, the ALJ must consider the entire record, including medical signs, laboratory findings, the claimant's statements about symptoms, any other information provided by treating or examining physicians, psychiatrists and psychologists, and any other relevant evidence in the record, such as the claimant's account of how the symptoms affect her activities of daily living and ability to work.[107]

Where more information is needed to assess a claimant's credibility, the ALJ must make every reasonable effort to obtain available information that would shed light on that issue. Therefore, the ALJ must consider the following factors relevant to symptoms, only when such additional information is needed:

(i) The applicant's account of daily activities;

(ii) The location, duration, frequency, and intensity of pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication the applicant takes or has taken to alleviate pain or other symptoms;

(v) Treatment, other than medication, the applicant receives or has received for relief of pain or other symptoms;

(vi) Any measures the applicant uses or has used to relieve pain or other symptoms (e.g., lying flat, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

---

[106] Credibility is the extent to which the statements can be believed and accepted as true.
[107] *See* 20 C.F.R. § 404.1529.

20

(vii)  Other factors concerning functional limitations and restrictions due to pain or other symptoms.[108]

### 7.    *Factors in Evaluating Credibility*[109]

A claimant's statements and reports from medical sources and other persons with regard to the seven factors, noted above, along with any other relevant information in the record, provide the ALJ with an overview of the subjective complaints, and are elements to the determination of credibility.

Consistency with the record, particularly medical findings, supports a claimant's credibility.  Since the effects of symptoms can often be clinically observed, when present, they tend to lend credibility to a claimant's allegations.  Therefore, the adjudicator should review and consider any available objective medical evidence concerning the intensity and persistence of pain or other symptoms in evaluating the claimant's statements.

Persistent attempts to obtain pain relief, increasing medications, trials of different types of treatment, referrals to specialists, or changing treatment sources may indicate that the symptoms are a source of distress and generally support a claimant's allegations.  An applicant's claims, however, may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show noncompliance with prescribed treatment.

Findings of fact by state agency medical and psychological consultants and other

---

[108] *See* 20 C.F.R. § 404.1529
[109] *See* SSR 96-7p.

physicians and psychologists regarding the existence and severity of impairments and symptoms, and opinions of non-examining physicians and psychologist are also part of the analysis. Such opinions are not given controlling weight. However, the ALJ, although not bound by such findings, may not ignore them and must explain the weight afforded those opinions in his decision.

Credibility is one element in determining disability. The ALJ must apply his finding on credibility in step two of the five-step disability determination process, and may use it at each subsequent step.

The decision must clearly explain, that is, provide sufficiently specific reasons based on the record, to the claimant and any subsequent reviewers, regarding the weight afforded to the claimant's statements and the reasons therefore.

The law recognizes that the claimant's work history should be considered when evaluating the credibility of her testimony or statements.[110] A claimant's testimony is accorded substantial credibility when she has a long work history, if it is unlikely that, absent pain, she would have ended employment.[111]

### 8. *Medical Expert Testimony*

The onset date of disability is determined from the medical records and reports

---

[110] *See* 20 C.F.R. § 404.1529(a)(3)

[111] *See Podedworny v. Harris*, 745 F.2d 210, 217 (3d Cir. 1984) citing *Taybron v. Harris*, 667 F.2d 412, 415 n.6 (3d Cir. 1981). In *Podedworny*, the claimant worked for thirty-two years as a crane operator for one company. He had a ninth grade education and left his employment after the company physicians determined that his symptoms of dizziness and blurred vision prevented him from safely performing his job.

and other similar evidence, which requires the ALJ to apply informed judgment.[112] "At the hearing, the administrative law judge (ALJ) employ the services of a medical advisor when onset must be inferred."[113]

## IV.    DISCUSSION

### A.    Parties' Contentions

Plaintiff argues the ALJ failed to properly weigh the medical opinion evidence and evaluate her credibility. She contends the ALJ erred by giving no weight to the limitations described by her treating physician, Dr. Beebe, and by giving significant weight to opinions from non-examining consultants.[114] Instead, according to Plaintiff, Dr. Beebe's opinions should have been given controlling weight. She also contends the ALJ mischaracterized the record by finding both Dr. Beebe and Plaintiff's opinions not credible.[115] She further argues that the ALJ's failure to consider all relevant factors was not harmless error, and his credibility determination is not supported by substantial evidence.[116]

To the contrary, Defendant maintains that substantial evidence supports the ALJ's evaluation of the medical source opinions, including appropriately giving no weight to an opinion of Dr. Beebe.[117] Defendant also contends that the ALJ properly evaluated Plaintiff's credibility as to subjective complaints of pain and limitations in

---

[112] See SSR 83-20.
[113] Id.
[114] D.I. 10 at 11-17.
[115] Id.
[116] Id. at 11-19.
[117] D.I.15 at 3.

23

combination with evidence of her symptoms, by finding Plaintiff not fully credible.[118]

## B. Analysis - Appropriateness of the ALJ's Assessment

The issue determined by the ALJ was whether Plaintiff is disabled under sections 216(I), 223(d), and 1614(a)(3)(A). The present issue for the court is whether the ALJ properly applied the legal standards in making the determination; more specifically, whether "substantial evidence" supports the ALJ's decision.[119] If the substantial evidence standard cannot be found, characterized as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," then this court may reverse the Commissioner's final determination that Plaintiff is not disabled under the Acts.[120]

As discussed throughout this opinion, Plaintiff's overarching contentions are the following: (1) the ALJ erred by giving no weight to the limitations described by her treating physician, and giving significant weight to opinions from non-examining consultants; and (2) the ALJ mischaracterized the record by finding both Dr. Beebe and Plaintiff's opinions not credible. Therefore, this court's decision is based upon whether the ALJ's analyses of the disability determination standards, under the headings "Weight Given to Treating Physicians" and "Factors in Evaluating Credibility," were reasoned in a manner meeting the required standard.[121]

### 1. ALJ's Reasoned Assessment finding Plaintiff not disabled.

---

[118] D.I.15 at 3.
[119] See supra part III (B).
[120] Id.
[121] See supra part III (C).

Applying the aforementioned standards of procedure, although the ALJ finds Plaintiff's impairments do cause significant limitations, he concludes that such limitations do not constitute a disability under the Acts in question. He considered all of Plaintiff's symptoms, and the "extent to which they could reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p . . . [and] opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-6p and 06-3p."[122]

Some of the impairments presented via medical documents and testimony are considered non-severe and cannot be found, even in combination with other impairments, to cause inability to do basic work. The gastrointestinal impairments are "stable," meaning they do not require ongoing treatment; therefore, they do not cause functional restrictions, and thus, are not "severe pursuant to SSR 96-4p."[123] The clinically determined mild depression and anxiety "do not cause more than minimal limitation do basic work, and therefore also not severe."[124]

After considering four broad functional areas set out in the disability regulations attributable to a determination of mental health of claimants, the ALJ made the following conclusions. In the first area, activities of daily living, Plaintiff has no limitation because she lives alone, performs personal care, and completes household chores. As to the second area, social functioning, Plaintiff has no limitation. Regarding the third

---

[122] D.I. 7-6 at 387.
[123] *Id.* at 385.
[124] *Id.*

25

element, concentration, Plaintiff has mild limitation because her concentration is affected by pain. Significantly, the ALJ observed that, "Dr. Beebe consistently notes normal memory in his records."[125] Considering the fourth aspect, episodes of decompensation, Plaintiff has not experienced any episodes of extended duration. In total, the ALJ found that Plaintiff's mental health limitations are non-severe.[126]

Upon assessment of Plaintiff's residual functional capacity, the ALJ concluded that Plaintiff does not have an impairment or combination thereof that is equivalent in severity to an accepted disability listed in the applicable regulation. In summary, Plaintiff's spinal impairments fail to meet testing criteria to indicate a compromise or compression of nerve roots or the spinal cord, or inability to ambulate. Her symptoms of asthma do not meet clinical criteria that would indicate severity to the level of an accepted disability under the Acts. Further, her problems with motor functioning of the upper extremities do not meet the definition of peripheral neuropathy, the neurological impairment listed in the regulation.[127]

After considering the entire record, the ALJ concluded that Plaintiff maintains the residual functional capacity to perform light work, with the exception of the following: she can only occasionally climb ladders, ropes or scaffolds, occasionally crawl, occasionally reach overhead with the bilateral upper extremities; occasionally handle, finger, and feel with her bilateral upper extremities; but may have frequent exposure to extreme cold, extreme heat, humidity, vibration, fumes, odors, dust, gas, and poor

---

[125] D.I. 7-6 at 389.
[126] Id.
[127] Id. at 390.

ventilation.

## 2. **Weight Given to Treating Physicians**

Although a treating physician's medical opinion should be given controlling weight, after considering all evidence of record in conjunction with his observations of Plaintiff and testimony at the hearing, the ALJ afforded no weight to the opinion of her treating physician, Dr. Beebe. The ALJ's decision regarding weight did not turn on whether the nature and severity of her impairments were well supported by medically acceptable clinical and laboratory diagnostic techniques, but rather on whether the opinion was inconsistent with the other substantial evidence in the record. This court agrees with the ALJ that Dr. Beebe's opinion was inconsistent with other substantial evidence.

Specifically, no weight was given to either Dr. Beebe's written opinion that Plaintiff is disabled and is "very unlikely to be able to return to the workforce" or his opinion set forth in two Multiple Impairment Questionnaires, which appear inconsistent in the determination of the severity of Plaintiff's conditions.[128] The ALJ found contradictions among Dr. Beebe's various medical opinions and in relation to other medical evidence of record. Specifically, the ALJ noted, "[i]n his treatment notes, Dr. Beebe never indicates [ ] extreme limitations or places [such] restrictions on the claimant and a recent office record from Dr. Beebe indicates normal ambulation and normal motor strength and tone."[129] Further, the ALJ found that the movement

---

[128] D.I. 10 at 5.
[129] D.I. 7-6 at 389.

27

restrictions in Dr. Beebe's opinions and Plaintiff's testimony were "not borne out by her actions at the hearing."[130]

The ALJ considered, as he must, the medical findings supporting Dr. Beebe's opinion that Plaintiff is disabled. His consideration was clearly indicated in the ALJ's November 3, 2014 decision, in which he pointed to specific inconsistences within Dr. Beebe's opinion and the record as a whole. For example, the ALJ noted that two separate Multiple Impairment Questionnaires indicate different severities of Plaintiff's condition. The ALJ rejected the treating physician's assessment, but did not make speculative inferences from medical reports; rather, his rejection was on the basis of contradictory medical evidence, including the vocational expert's testimony and medical reports of other physicians who treated and evaluated Plaintiff.

Notably, under the disability determination standard, a statement by a treating source that a claimant is disabled is not a medical opinion.[131] The ALJ is the only one with authority to decide whether plaintiff is disabled. In other words, a finding of "disabled" by a treating physician does not equate to the definition of disabled under the Acts. Therefore, Dr. Beebe's written opinion that Plaintiff is disabled is not dispositive, and the ALJ did not err in rejecting it as a medical opinion.

### 3. *Factors in Evaluating Credibility*

As stated above, a claimant's statements and reports from medical sources and other persons, along with any other relevant information in the record, provide the ALJ

---

[130] D.I. 7-6 at 389.
[131] *See* 20 C.F.R. § 416.927 (e)(1).

with an overview of the subjective complaints, and are elements to the determination of credibility. However, the key component in the assessment of Plaintiff's credibility is consistency between her testimony and the record. Plaintiff's claims may be less credible if the level or frequency of treatment is inconsistent with the degree of her complaints, or if the medical reports or records show noncompliance with prescribed treatment.

The ALJ concluded Plaintiff's testimony was not credible due to its inconsistency with other evidence in the record. For example, the ALJ states: "[a]lthough the claimant testified she continues to experience severe right upper extremity limitations, the record indicates improvement with exercises and ability to go on a vacation less than a month post-surgery."[132] The ALJ considered the record in comparison to Plaintiff's testimony and concluded her "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however . . . [her] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible . . . ."[133] The ALJ did not observe during the hearing, the severity of she claimed finding her testimony and Dr. Beebe's opinion not credible. The ALJ specifically noted in his decision, "the hearing lasted for forty-five minutes without the claimant having to get up and move around. This undermines her entire testimony on the severity of her impairments."[134]

Further, proper application of the credibility standard requires the ALJ's decision

---

[132] D.I. 7-6 at 388-89.
[133] Id. at 388.
[134] Id. at 389.

29

to clearly explain the weight afforded to the claimant's statements and his reasoning, by including sufficiently specific reasons from the record. The examples cited herein of his reasoning, clearly delineated in his decision, suffice.

Plaintiff argues that the opinions of state agency medical consultants should not have been afforded great weight. However, findings of fact by state agency medical and psychological consultants, other psychologists and physicians, and the opinions of non-examining physicians regarding the existence and severity of impairments and symptoms are part of the analysis. The ALJ considered the vocational expert's testimony, and also added limitations in Plaintiff's favor to that assessment, in making the final determination of disability. The ALJ did not give the vocational expert's opinion controlling weight, and therefore, did not err.

## C.    Summary Judgement Application

As stated above, in determining the appropriateness of summary judgment, the court is required to review the entire record and draw all reasonable inferences in favor of the non-moving party, but cannot weigh the evidence or make credibility determinations.[135] In the absence of any genuine issue of material fact, then summary judgment is appropriate for the movant.[136]

### 1.    *Defendants' Motion*

This court, consistent with the finding by the ALJ, determines that Dr. Beebe's opinion was inconsistent with other substantial evidence: therefore, the ALJ did not err

---

[135] *See supra* part III (A).
[136] *Id.*

by affording no weight to his opinion regarding disability. Moreover, under the disability determination standard, a comment by a treating source that a claimant is disabled is not a medical opinion, and only the ALJ is authorized to decide the issue of disability, as when supported by substantial evidence in the record. Thus, this court has no bases to reverse or remand the ALJ's decision, since there is no indication that the ALJ acted beyond his regulatory authority.

The same analysis applies to the ALJ's conclusion that Plaintiff lacked credibility. The ALJ found her testimony inconsistent with other evidence in the record, which was thoroughly explained throughout his written decision. For example, the ALJ noted that despite Plaintiff's testimony of continued severe right upper extremity limitations, the record contradicts her testimony and indicates improvement with exercises, with Plaintiff going on vacation within a month post-surgery.[137] As explained in the decision, his personal observations of Plaintiff's condition during the hearing were inconsistent with her allegations of severity.

Previously, in this decision, this court analyzed the propriety of the ALJ's decision based solely on the grounds applied by the ALJ,[138] finding his determination proper and consistent with the record. Therefore, Defendants' motion for summary judgment is granted.

### 2.    *Plaintiff's Motion*

Plaintiff not only sought reversal of the final decision of the Commissioner

---

[137] *Id.*at 388.
[138] *See supra* part III (A).

denying her disability benefits. but alternatively, requests this matter be remanded for a new hearing on the issue of whether she is disabled. Because the his findings that Dr. Beebe's opinion was inconsistent with other substantial evidence are appropriately supported by the record, the ALJ did not err by affording no weight to Dr. Beebe's determination regarding disability. Since the ALJ applied the correct standards and properly evaluated the facts, which are supported by substantial evidence in the record, Plaintiff's motion for summary judgment is denied.

## VI. CONCLUSION

For the reasons contained herein, I recommend that:

1. Plaintiff's motion for summary judgement be denied.

2. Defendant's motion for summary judgement be granted.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. P. 72(b)(1), and D. DEL. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.

The parties are directed to the Court's Standing Order in Non-Pro Se matters for Objections Filed under FED. R. CIV. P. 72, dated October 9, 2013, a copy of which is available on the Court's website, www.ded.uscourts.gov.

Date: May 23, 2017                          /s/ Mary Pat Thynge
                                            United States Magistrate Judge

32